TENNESSEE ADJUSTMENT SERVICE, INC., Complainant-Appellant, v. CHARLES F. MILLER, JR., Defendant-Appellee. —390 S.W.(2d) 696.

Middle Section. December 31, 1964.

Certiorari Denied by Supreme Court May 3, 1965.

Charles L. Cornelius, Nashville, Cornelius & Collins, Nashville, of counsel, for complainant-appellant.

Robert C. Taylor, Nashville, Trabue, Minich, Sturdivant & Harbison, Nashville, of counsel, for defendant-appellee.

CHATTIN, J. This is an appeal by complainant, Tennessee Adjustment Service, Inc., from an adverse decree dismissing its suit against the defendant, Charles F. Miller, Jr., and dissolving a temporary injunction previously granted enjoining and prohibiting the defendant from violating the restrictive provisions of an alleged employment contract with complainant.

The material allegations of complainant's bill were that complainant was engaged in the business of operating what is generally known as a collection agency; that in its business of collecting accounts for business organizations and professional men, it has a system which is unique and which has been developed through long expe-

rience in this business; that its list of clients and forms used are trade secrets; that at the time defendant began to work for complainant on August 23, 1954, he knew nothing of the collection business and has learned the system used by complainant as well as its trade secrets; that since defendant's employment by complainant in 1954 complainant and defendant have entered into two written employment contracts on July 7, 1961, and August 23, 1962, respectively.

These contracts are exhibited to the bill and provide as follows:

"In further consideration of the position of Mr. Charles F. Miller, Jr., hereafter to be known as the Party of the Second Part, and Tennessee Adjustment Service, Inc., hereafter to be known as the Party of the First Part.

"The party of the First Part agrees to pay the Party of the Second Part two per cent (2%) on new business from creditors assigned to him; business may be secured in person, by telephone, or mailed to this office; with a minimum on any one account to be $300. On any accounts over $300 that are collected, then the regular commission will be paid on all those accounts after they are collected.

"A Commission of one per cent (1%) is to be paid on accounts from hospitals and clinics located outside of Davidson County. Should it become evident, after a period of six months' time or more, that this business from clients located outside of Davidson County is worth more than 1%, then a new basis would be agreed upon.

"On accounts from physicians, dentists, and hospitals inside of Davidson County that 2½% is being paid on now, will remain the same.

"The Party of the First Part agrees to pay the Party of the Second Part Five dollars ($5.00) for each new client he secures, provided that he receives at least ten (10) accounts at one time. The Party of the First Part also agrees to pay the Party of the Second Part Five dollars ($5.00) on business received from a client wherein the Party of the First Part has not received any business from the client within a period of two years.

"It is agreed by the Party of the Second Part that any client or prospect assigned to him wherein new business is not received within two years from the date the Party of the Second Part is assigned the client or prospect, that no commission will be allowed on any new business.

"The Party of the First Part agrees to pay Two Hundred Dollars ($200) per month, payable semi-monthly, on the 1st and 15th of each month. The Party of the First Part further agrees to pay the car expense of the Party of the Second Part, not to exceed Fifty Dollars ($50) per month. The Party of the First Part agrees to allow a Miscellaneous Expense account for coffee, lunch, etc., not to exceed $30 per Mo.

"It is further agreed that the Party of the First Part has the authority to accept or decline any business that is considered worthless, and that no commission will be paid on accounts against minors, bankrupts, or accounts out of date. And it is further agreed by the Party of the Second Part that in the event that any

accounts should be secured under the above classification that they will not be offered to any competitor.

\*　\*　\*　\*　\*　\*

"The Party of the Second Part further agrees that he will not enter into competition with the Party of the First Part. And in the event that the Party of the Second Part resigns or leaves the Party of the First Part for any cause, the Party of the Second Part agrees not to work for any competitor in Davidson County for a period of two years.

"It is further agreed by the Party of the Second Part that he will keep all trade information and trade secrets, which he may obtain, confidential with due care and diligence that our competitors will not have access or knowledge of them.

TENNESSEE ADJUSTMENT SERVICE, INC.
PARTY OF THE FIRST PART

W. H. King

W. H. King, President-Treasurer

PARTY OF THE SECOND PART

Charles F. Miller, Jr.
Charles F. Miller, Jr.

Nashville, Tennessee 7-1-1961."

"This agreement made this 29th day of August, 1962, at Nashville, Tennessee by and between TENNESSEE ADJUSTMENT SERVICE, INC., hereinafter called 'Employer' and Mr. Charles F. Miller, Jr., hereinafter called 'Employee.'

*WITNESSETH:*

"1. Employer agrees to employ Employee for an indefinite period of time so long as he or she satisfac-

torily performs the duties of the position or positions to be filled by Employee, and such employment may only be terminated by either party by giving two weeks notice to the other, provided, however, that Employer may discharge Employee for cause without advance notice. Whenever notice hereunder is required of Employer, it shall have the option of electing to pay Employee two weeks compensation at the regular rate of pay in lieu of such notice.

\* \* \* \* \* \*

''3. In the position or positions to be filled under this employment, Employee will receive certain information and instruction which might be designated as 'trade secrets' or 'system of doing business,' and as a part of the consideration of this employment, Employee agrees that, upon the termination of this employment, Employee shall not, for a period of two years after such termination, directly or indirectly, engage in the same or similar business as that engaged in by Employer, either individually as a member of a firm, employee of a corporation, or as employee of an individual, within Davidson County, Tennessee or the area embraced within a radius of fifty miles of Davidson County, Tennessee.

''4. Employee further agrees that he or she will not, at any time while in the employ of Employer, divulge to any person whomsoever any of the trade information or professional secrets which he or she may obtain in the course of this employment, and will devote his or her best efforts to this employment under the direction of Employer, its officers and agents.

''Signed and executed in duplicate at Nashville, Tennessee the day and date first above set out.

TENNESSEE ADJUSTMENT SERVICE, INC.
By W. Harvey King

W. Harvey King, President-Treasurer

EMPLOYER

Charles F. Miller, Jr.

EMPLOYEE.

"Supplement to Contract made this 29th day of August, 1962, at Nashville, Tennessee by and between TENNESSEE ADJUSTMENT SERVICE, INC., hereinafter called 'Employer' and Mr. Charles F. Miller, Jr., hereinafter called 'Employee.'

"1. Employer agrees to pay the Employee 1½% on all out-of-town Medical-Dental-Hospital Bureau of Nashville new business instead of the agreed 1%.

"2. Employer agrees to strike out the section of the original agreement with the Employee which states that the Employee will be paid commissions on accounts over $300.00 when they are collected in full.

"3. Employer agrees to add the following to the original contract with the Employee: If the monthly quota of $75,000.00 is reached by the Employee during any one month, the Employee will receive one (1) share of stock at $10.00 per share for every share Employee purchases up to three (3) shares.

"4. Employee agrees that when his income bonus, commissions or compensation exceeds $1,000.00 per month he will take it out in stock in the company of Tennessee Adjustment Service, Inc., until all outstanding stock has been issued.

TENNESSEE ADJUSTMENT SERVICE, INC.

By W. Harvey King

W. Harvey King, President-Treasurer

EMPLOYER

Charles F. Miller, Jr.

EMPLOYEE."

The bill further alleged complainant had fully complied with its obligations under the contract; that defendant continued to work under the contract until November 19, 1963, at which time he resigned; that on November 22, 1963, defendant began to work for the "Business and Professional Adjustment Service" in Nashville, a corporation incorporated under the laws of Tennessee; and that complainant had been advised this business was organized by defendant and was authorized under its charter to operate a collection agency in direct competition with complainant's business.

The prayer of the bill was for an injunction enjoining and prohibiting defendant from a further violation of the restrictive provisions and for damages for breach of the contract.

A temporary injunction was issued restraining defendant from directly or indirectly engaging in the collection business within the restricted territory.

The defendant, in his answer, admitted the execution of the contracts and that he had worked for complainant until November 1963, at which time he resigned and began to work for the Business and Professional Adjustment Service, a collection agency in Nashville.

He averred, however, that after the execution of the contract in August 1962, complainant by and through its

President and agent, W. Harvey King, had orally agreed to give defendant the option to buy a sufficient amount of stock in the corporation to secure the controlling interest therein in the event of a sale of the company; that King had also orally agreed to release defendant from the employment contract in part consideration of defendant conveying his stock to King, which he did; and that complainant had breached both oral agreements by the secret sale of the business to Charles Martin and refusing to release defendant of his obligations under the contract after defendant transferred his stock to King.

He further averred complainant, by and through its agent, Charles Martin, had breached the employment contract by arbitrarily reducing his compensation to such an extent as to force defendant to resign and seek other employment.

Defendant denied there was any unique system or trade secrets in the collection business.

His answer alleged it would be inequitable for complainant to be permitted to arbitrarily reduce his compensation and then enjoin him from working in a similar business.

Prior to the hearing of the cause on the motion of defendant, the Chancellor dismissed the temporary injunction.

On motion of defendant and order of the Chancellor the cause was heard on oral testimony and documentary proof.

The Chancellor filed a memorandum opinion in which he found the complainant had breached its contract with

defendant in several particulars and therefore was in no position to maintain its suit.

Complainant has perfected an appeal to this Court and assigned two assignments of error.

Although neither complainant's charter nor its by-laws were offered in evidence, the evidence in the case discloses that King was the President and General Manager of the complainant's business. It is conceded he owned the controlling stock. After the execution of the employment contract in August 1962, King became interested in selling the business due to his health and the financial difficulties of the company. He and defendant had some conferences in which King agreed defendant could have the option to purchase the controlling interest in the company in the event of a sale. Thereafter, King became interested in purchasing defendant's stock. During these negotiations, King agreed to release defendant from his obligations under the employment contract as part consideration for defendant conveying his stock to him. King, after defendant had transferred his stock to him, told defendant his lawyer had advised him such an agreement would not bind the corporation since the contract was an asset of the corporation.

Subsequent to the sale of defendant's stock to King, defendant was advised the assets of the company had been sold to Charles Martin. In June 1963, Martin, King and defendant met at the Richland Country Club for a conference. At this conference, Martin told defendant he had assumed the management of the company's business and it was his desire the defendant and King remain in the employment of the company on the same basis as in the past.

On October 14, 1963, Martin advised defendant that it was necessary to eliminate some of the provisions of the contract relative to his compensation. Specifically, he told defendant the provision relative to commissions on out of town hospital, medical and dental accounts would not be paid on such accounts where mail to the debtors was returned, since such accounts were worthless; and that the provisions for automobile expenses, the $5.00 bonus for new clients and miscellaneous expenses would be eliminated as part of his compensation.

Defendant testified he had also been receiving a bonus of $75.00 for new business acquired in excess of $75,000.00 in any one month and the company paid one-half of his dues as a member in the Rotary Club, the Nashville City Club and the Nashville Retail Credit Bureau; and Martin had advised him at the time these items would not be paid. He further testified Martin told him the elimination of all of the foregoing provisions as to his compensation would be retroactive to October 1, 1963. Martin denied he had discussed these provisions, the bonus and dues, with defendant since they did not appear in the contract.

The record shows, however, that defendant in his statements to complainant had listed such items as due him as part of his compensation for the months of June, July, August and September 1963, and were paid by complainant.

Defendant protested and advised Martin he could not accept the reduction in salary. However, he continued to work for complainant until November 19, 1963, and was paid the sum of $1,020.69 for his services from October 14, to November 19, 1963, at which time he resigned and went to work for the Business and Professional Service, a

company which he assisted in organizing with offices in Nashville.

It is conceded by complainant Martin had the authority to speak for and bind the corporation.

From the foregoing evidence, the Chancellor held complainant had breached the oral agreements of King in which he agreed to give Miller the option to purchase the company and in the event of a sale to a third party defendant would be relieved of his obligations under the contract as well as the promise of King to relieve defendant of his obligations under the contract as part consideration for the sale of defendant's stock to him; and that complainant had further violated the contract by reducing defendant's compensation.

It is insisted by complainant the Chancellor erred in denying the injunctive relief sought on the ground King had violated or breached the oral agreements.

In support of this insistence complainant insists King had no authority to bind the corporation and further if it can be said he did have such authority then defendant had waived these breaches as a defense to the suit because he continued in the employment of complainant several months after learning of each breach and took no action to enforce his rights thereunder.

■■ We do not deem it necessary to discuss the proposition of whether King had authority to bind the company by his oral promises to Miller. In any event, we agree with Counsel for complainant the defendant waived any such breach of the contract as a defense to this suit by remaining in the employment of complainant and receiving the benefits of the contract.

"It seems to be the rule generally that strict performance of a contract by one party may be waived by the other party, and conditions precedent may be waived by the party in whose favor they are made." Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publishing Company, 42 Tenn.App. 92, 298 S.W.(2d) 788.

It is next insisted by complainant the Chancellor was in error in finding the complainant arbitrarily reduced defendant's compensation and was a complete defense to complainant's bill for injunctive relief.

In support of this assignment, it is first argued that the preponderance of the evidence shows there was no reduction of defendant's compensation; and, secondly, regardless of whether complainant breached the contract in this regard, the covenant not to compete is nevertheless enforceable by injunction, it being an independent covenant rather than dependent.

As to the first argument, we are unable to say the evidence preponderates against the finding of the Chancellor that complainant reduced defendant's compensation by eliminating certain provisions of the contract relative to defendant's compensation. The record shows complainant had been paying the commissions and expenses prior to October 14, 1963, which were eliminated by Martin.

As to the second argument the restrictive covenant is an independent rather than a dependent covenant, we are of the opinion is without merit for the reason the covenant not to compete is dependent upon the employment provisions of the contract and neither can exist without the other. Thus, the contract is entire and must

stand or fall together. Felton Beauty Supply Company v. Levy, 198 Ga. 383, 31 S.E.(2d) 651, 155 A.L.R. 647.

Finally it is insisted by complainant that, in any event, defendant waived his right to rescind the contract when Martin advised him of the reduction in his compensation by remaining in the employment of complainant and accepting the benefits under the contract until the contract was terminated by his resignation.

To support this contention complainant cites and relies on the case of Federated Mut. Imp. and Hdw. Ins. Co. v. Johnson, 53 Tenn.App. 288, 382 S.W.(2d) 214. But we think the facts in that case show the defendant therein intentionally relinquished his right to rescind the contract for the alleged breach. He did not protest or take any action relative to the alleged breach and stated, ''[H]e wanted to get from under the contract, and 'just let it go.' ''

In the case at bar, defendant protested and told Martin he would not agree to a reduction in his compensation. Although defendant may have taken Martin at his word and rescinded the contract at the time, it is our opinion he also had a right to insist upon the performance of the original contract, as he did, and that he did not waive his right to rescind by waiting a reasonable time thereafter during which complainant acted upon the declarations of Martin.

Furthermore, we think the action of defendant in not agreeing to a modification of the contract was notice to complainant he did not intend to waive any right he might acquire if complainant persisted in its avowed intention of not fulfilling its obligations under the original contract. It is elemental a waiver is an intentional

relinquishment of a known right, or such conduct as warrants an inference of such intent.

Complainant had until the end of October to fulfill its obligations under the original contract since defendant was paid monthly. Thus, the actual breach did not occur until that time. Defendant remained in the employment for only nineteen days thereafter at which time he rescinded the contract by resigning. Such delay was not so unreasonable as to amount to a waiver of his right to rescind. Nor do we think it resulted in prejudice to complainant.

"Many cases have held that a right to rescind, abrogate, or cancel a contract must be exercised promptly on discovery of the facts from which it arises, and that it may be waived by unreasonable delay or by continuing to treat the contract as a subsisting obligation. The correlative rule is that the right to rescind must be exercised within a reasonable time, or with 'reasonable promptness,' after discovery of the facts from which it arises. According to some cases, however, the question as to whether a contract has been rescinded within a proper time therefor is not necessarily to be determined by the particular amount of time which has elapsed before the attempted rescission, the important consideration being whether the period has been long enough to result in prejudice to the other party." 17 Am.Jur.2nd, Contracts, Section 510, pages 992, 993.

We conclude the evidence does not preponderate against the decree of the Chancellor and his decree is affirmed with costs.

Shriver and Humphreys, JJ., concur.