ELMORE ET UX. *v.* REESE ET UX.

[No. 39, September Term, 1972.]

*Decided April 3, 1973.*

*Motion for rehearing filed May 3, 1973; denied May 7, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*Fred I. Simon* for appellants.

*Harleigh P. Ewell* for appellees.

SMITH, J., delivered the opinion of the Court.

This case grows out of a contract for sale of a home. Appellants Oscar M. Elmore and wife (the Elmores) entered into a contract on August 8, 1967, to purchase a home in Bowie, Maryland, from appellees Gunther Reese and wife (the Reeses). On August 23 permission was granted the Elmores to take possession of the home on August 26 at a daily rental charge of $5.50 per day "from the day of occupancy until the date full and final settlement [was] made by them." Disagreements arose and settlement did not take place. The Reeses then sued the Elmores for specific performance. The home was sold to other purchasers and the case was transferred to the law side of the docket. Maryland Rule 515. The Reeses then filed a declaration in law claiming damages. A counterclaim was filed by the Elmores. After trial before the court without a jury judgment was entered in favor of the Reeses against the Elmores on the original suit and the counterclaim.

The Elmores seek reversal claiming (1) that they were denied their constitutional right to a jury trial, (2) that they could not present their case properly because parts of the equity record were missing, (3) that dismissal of an action brought by the Reeses against the Elmores in the People's Court of Prince George's County was res judicata, (4) that there was a violation of the attorney-client relationship because the original counsel for Reese in this case was the attorney involved in the settlement proceedings, and (5) that they are not responsible in damages because there was no delivery to them of an FHA certificate of reasonable value as required by the contract of sale. We shall affirm. We shall set forth additional facts as we proceed with this opinion.

**(i)**

The declaration in the law action was filed by the

Reeses on March 26, 1969. It became at issue with the filing on June 16, 1969, of the pleas on behalf of the Elmores. On the same day the declaration in the counter-claim of the Elmores was filed. That became at issue on July 30, 1969. It was not until December 4, 1969, that the Elmores filed a demand for a jury trial. The request was denied. The statement of points and authorities filed by the Reeses said the jury demand did not comply with Seventh Circuit Rule 547 a 2. That rule required that a demand for a jury trial on behalf of a defendant be made at or before the first filing of a plea on the merits, but not after the time for filing a plea to the merits.

Maryland Rule 343 was added February 10, 1969. Our order adopting it and other rules provided for them to "take effect on April 1, 1969, and [to] apply to all pro-ceedings thereafter commenced and, *so far as [might] be practicable, to all proceedings then pending.*" (Em-phasis added.) Rule 343 c states:

> "A defendant, including a third party, shall make such election [for jury trial] at or before the time for filing his first responsive pleading to the merits, which places the case at issue as to him."

Quite obviously, it was "practicable" for this rule to apply to the Elmores as defendants and counter-plaintiffs.

On the issue of constitutionality of such a rule Judge Singley said for the Court in *Bettum v. Mont. Fed. S. & L. Ass'n,* 262 Md. 360, 277 A. 2d 600 (1971):

> "We have held that the right to a jury trial may be subjected to reasonable regulation and that a local rule of court requiring that an affirmative written election for a jury trial be made at the time of the filing of the first plead-ing does not offend the constitutional guarantee, *Houston v. Lloyd's Consumer Acceptance Corp.,* 241 Md. 10, 215 A. 2d 192 (1965), a limitation which has been made applicable to all courts by

Rule 343, which became effective before Bettum brought suit. *Segal v. American Casualty Co. of Reading, Pennsylvania,* 250 F. Supp. 936 (D. Md. 1966)." *Id.* at 366.

*See also,* in addition to *Houston v. Lloyd's,* 241 Md. 10, 215 A. 2d 192 (1965), cited by Judge Singley, *Md. Community Dev. Inc. v. S.R.C.,* 261 Md. 205, 211-13, 274 A. 2d 641 (1971), and *Chappell Chemical Co. v. Sulphur Mines Co.,* 172 U. S. 474, 19 S. Ct. 268, 43 L. Ed. 520 (1899). In the latter case the Supreme Court affirmed a decision of our predecessors in 85 Md. 684 (unreported), 36 A. 712 (1896), upholding a rule in the law courts of Baltimore City which even at that time restricted the right to a jury trial unless requested within a specified time. In *Lloyd's* Judge McWilliams observed for the Court:

"[I]t is generally acknowledged that [the right to a jury trial] can, for all practical purposes, become meaningless to the individual and burdensome to the state unless the exercise of it is regulated to some extent." *Id.* at 14.

Accordingly, this contention of the Elmores is without merit.

There is a collateral matter which we must consider. The Elmores in their brief said:

"As soon as the case became a Law case, the Elmores demanded a jury trial which was denied without a hearing by Judge McCullough on December 11, 1969 (E. 24). A jury demand was subsequently repeated and again denied (E. 17)."

The reference to page E24 of the record extract has to do with the denial of the request for a jury trial. On page E25 appears a jury demand which they show as having been filed on December 4, 1969, a showing that is consistent with the docket entries and with the original in the record. The document appearing on page E17 is

styled "PETITION OF OSCAR M. ELMORE RENEW-
ING DEMAND FOR JURY TRIAL" and shows that it
was filed on June 30, 1970, which is consistent with the
docket entries and the original appearing in the court
record. The Reeses in their brief said:

> "Seventh Circuit Rule 547 a 2 required an
> election for jury trial to be made before the time
> allowed by law or rules of court for a plea to
> the merits to be filed. This was not done, and
> Appellants' statement that 'as soon as the case
> became a law case, the Elmores demanded a
> jury trial' is false."

The Elmores have taken umbrage at use of the word
"false." They have moved that "the offensive accusa-
tion with the word 'false' be deleted and expunged from
the briefs filed." Since neither the docket entries nor the
papers on file in the record show a demand for a jury
trial by the Elmores prior to December 4, 1969, the mo-
tion will be denied.

### (ii)

Following denial of the Elmores' tardily filed request
for a jury trial, Mr. Elmore addressed a letter to the
Clerk of the Circuit Court for Prince George's County
expressing his inability to understand the ruling. He
then said:

> "I am convinced that there is prejudice
> against me in this case and am of the opinion
> that I cannot get a fair trial in this county. I
> am, therefore, demanding a change of venue."

Since this was sworn to, it was treated as a suggestion
for removal under Rule 542 and the case was removed to
Calvert County. Several times during the trial there
counsel for the Elmores claimed part of the equity
record was missing. It is difficult to fathom from the
Elmores' brief just what prejudice they believe accrued
to them. However, the docket entries reflect that on

February 2, 1970, counsel were notified by the office of the Clerk of the Circuit Court for Prince George's County that they might inspect the record prior to its being transmitted to Calvert County. One may infer that either counsel for the Elmores did not avail himself of that privilege or that he then found nothing missing which he believed should be there. Moreover, in the process of the trial when counsel said he was "very handicapped as [sic] a failure to have this Equity file [t]here," the trial judge replied, "It is here, it has been here all the time." Counsel protested that it was not complete and Judge Taylor offered counsel an opportunity to go through the file. Judge Taylor pointed out that the complete equity file was there. We have examined the complete equity file and find no merit in this claim of the Elmores.

### (iii)

The contentions relative to res judicata center around the refusal of the trial judge to admit into evidence a copy of an order in the People's Court of Prince George's County dismissing "with prejudice" an action brought by the Reeses against the Elmores. Two reasons were given by the trial judge, the fact that it was not a court of record, as indeed it was not, and the fact that it was not under seal. The doctrine of res judicata was fully explored for the Court by Chief Judge Hammond in *Pat Perusse Realty v. Lingo,* 249 Md. 33, 238 A. 2d 100 (1968). For the purpose of this opinion we need go no further than to say that in a case such as this where the only evidence proffered to the trial court was that an action had been dismissed "with prejudice" without a presentation to that court of anything from which the issues involved could be gleaned, such evidence could not be the basis of a determination that the doctrine of res judicata was applicable, since, quoting *Perusse,* there would be no showing "that facts or questions which were in issue in a previous action and were therein determined by a court which had jurisdiction of the parties and the

subject matter [were] conclusively settled by a final judgment in the first case . . . ."

### (iv)

The contract in this case contained a provision by which the Elmores "authorize[d] the [realtor] to order the examination of title and the preparation of all necessary conveyancing papers." Pursuant to that authorization the attorney was retained who ultimately brought the action on behalf of the Reeses against the Elmores, not the present counsel for the Reeses.

It is the contention of the Elmores that the Reeses "were guilty of violation of privileged communication; without the knowledge that [the attorney] learned about his client at the settlement proceedings, he and [present counsel for the Reeses] could not have been aware of the existing contract upon which they filed suit for specific performance, first in the court of equity and then continued for five long costly years; nor would they have known about the F.H.A. proceedings which they tried to destroy with derogatory letters to F.H.A. as well as to Floyd E. Davis, the mortgage company." They then go on to speak of the sanctity of the attorney-client relationship and how the United States Navy "treats such privileged communication almost as holy as the relationship between a priest and his [penitent]."

For the purposes of this opinion we do not have before us the issue of whether the attorney was or was not guilty of any unprofessional conduct in the docketing of the suits in question and we are not to be understood in this opinion as expressing any view, favorable or unfavorable, upon that subject.

There can be no question but what the Reeses knew of the contract between them and the Elmores which they signed, nor can there be any question that they and the realtor were cognizant of a commitment from a mortgage broker. Thus, these were not of a confidential nature.

The attorney was called as a witness by the Reeses

at the trial below. He testified that he became aware of the contract when he was notified by the realtor "probably through their secretary and they requested that [he] handle the settlement." At one point the record is as follows:

> "Q. Have you ever received any confidential information for [sic] Mr. Elmore at all? A. No, I did not.
> "(Judge Taylor) Now do I understand you to say Mr. Sinclair that you never talked to him regarding settlement? A. Maybe I answered Mr. Ewell's last question technically, but I talked to him at settlement, there were other persons present so there wasn't any confidential communications. . . ."

No objection was interposed on behalf of the Elmores to the testimony of the attorney. Accordingly, they will not be heard to complain here. The situation is comparable to that where an objection is offered to testimony and then without objection virtually the same testimony comes from a witness at a later time in the proceedings. On that subject Judge Prescott said for the Court in *Forrester v. State,* 224 Md. 337, 344, 167 A. 2d 878 (1961), "[I]f we assume without deciding that the evidence was inadmissible, any objection to its admission was waived by its subsequent admission without objection." *See also Spriggs v. Levitt & Sons, Inc.,* 267 Md. 679, 298 A. 2d 442 (1973) ; *Hyson v. State,* 225 Md. 140, 142, 169 A. 2d 449 (1961) ; *Journigan v. State,* 223 Md. 405, 412, 164 A. 2d 896 (1960) ; and *State Roads Comm'n v. Bare,* 220 Md. 91, 93-95, 151 A. 2d 154 (1959). *Cf. Baltimore & O.R.R. v. Plews,* 262 Md. 442, 470-71, 278 A. 2d 287 (1971).

### (v)

The contention of greatest importance raised by the Elmores revolves around the provision of the contract in which it is stated:

"F.H.A. Guaranteed Loan. These provisions only apply when the purchaser is buying with an FHA guaranteed loan. It is expressly agreed that, notwithstanding any other provisions of this contract, the purchaser shall not be obligated to complete the purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the seller has delivered to the purchaser a written statement issued by the Federal Housing Commissioner setting forth the appraised value of the property for mortgage insurance purposes of not less than $21,450.00 which statement the seller hereby agrees to deliver to the purchaser promptly after such appraised value statement is made available to the seller. . . ."

A document was produced which showed:

"ESTIMATED FHA VALUE

| | |
|---|---|
| Value (Excl. Cl. Costs) | $20,750 |
| Closing Costs | $ 700 |
| FHA VALUE | $21,450" |

This document was a "CONDITIONAL COMMITMENT FOR MORTGAGE INSURANCE UNDER THE NATIONAL HOUSING ACT" relative to subject property. Mr. Elmore's comment was that at settlement:

"I looked at it and I took objection immediately due to the fact that I was actually looking for the appraisal report and I questioned the closing cost being shown on there and that figure, the $21,450.00 had been cited to me as the appraised value, it was discussed only briefly. Mr. Sinclair told me that the rest of the attorneys in the area pretty much agreed that the $21,450.00 was the appraised value and I said I would have to see somebody else, seek better legal advice on the thing, because I didn't agree with the concept in the matter. So he actually

referred, gave me the names of two or three attorneys that I might contact."

At trial the Reeses produced a mortgage banker who testified in response to the question:

"[I]s the appraised value for mortgage insurance purposes shown on that Form that you hold?

"A. The appraised value for mortgage insurance purposes interpreted to be the total estimate of value on it, including closing costs."

Then he was asked whether "the item indicated on [the FHA form was] FHA value" and replied, "Right." No citation to any authority as to a contrary view as a matter of law has been given.

The Elmores contend, "The law requires that FHA mortgagors receive a statement of 'appraised value' prior to the sale of the property." They say they did not receive such statement. One witness, an employee of the realtor, testified that she had the FHA appraisal report in her hand and showed it to Mr. Elmore on the same day that he signed the contract of sale. The realtor testified that while negotiations were going on between Mr. Elmore and Mrs. Carlyle, the employee to whom we just referred, he had been out of the office. He remembered coming back in when the parties were engaged in a discussion and Mrs. Carlyle asked the realtor as to whether the Reeses would accept the appraised value of the property. He advised that because of a previous conversation he knew they were not inclined to do so, but that he felt they would accept a higher figure, named by the realtor. He stated Elmore "then said that that amount of money didn't make a difference that he would like to buy the house." In response to a question as to whether the figure of $21,450 was mentioned as the appraised value, the reply was given by the realtor:

"Yes, that was the idea of the discussion, would Mr. Reese accept the $21,450.00, which was the

> appraised value and I said I didn't think so,
> but I thought he would accept a higher figure."

The case is thus brought within the purview of *Hill v. Benevicz,* 224 Md. 79, 167 A. 2d 104 (1961). There, in an effort to avoid forfeiture of a $1,000 downpayment, it was contended that there had been no delivery of an FHA appraisal report. In striking down this contention Chief Judge Brune said for the Court:

> "Hill received verbally all of the information which physical delivery of the certificate would have given him. We think that there was thus substantial performance of the seller's promise to deliver the certificate and that the purchasers waived literal compliance with the provision for actual and prompt delivery . . . . Also, no possible damages to the purchaser by reason of a verbal instead of a written communication, or by reason of a failure to advise them of the appraisal at an earlier date, are even suggested." *Id.* at 88.

Thus Maryland Rule 886 is brought into play since it provides that when an action has been tried by the lower court without a jury, that "this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

The trier of facts, be it court or jury, is required to sift the truth out of conflicting testimony and to make a decision as to what to believe. We are not upon the scene. We do not observe the witnesses and their demeanor. It is much like a baseball game. A manager may protest until he is blue in the face a decision that a given pitch is a ball or a strike or a decision as to whether a runner is or is not safe at a given base, but the league president as the reviewing authority will not reverse what is essentially a judgment call because he is not on

the scene and he does not observe the pitch or the runner. It is this which has led to such comments as that of Judge Digges for the Court in *A. S. Abell Co. v. Skeen,* 265 Md. 53, 288 A. 2d 596 (1972) :

> "Under [Rule 886] we must consider the evidence produced at trial in a light most favorable to the prevailing party there and if substantial evidence was presented to support the trial court's determination, it is not clearly erroneous and cannot be disturbed. However, the conclusions of law based on the facts can be reviewed. *Liller v. Logsdon,* 261 Md. 367, 368-69, 275 A. 2d 469 (1971) ; *Simmons v. B & E Landscaping Co.,* 256 Md. 13, 17, 259 A. 2d 314 (1969)." *Id.* at 55.

It has produced the further observation that the statement by Judge McWilliams for the Court in *Racine v. Wheeler,* 245 Md. 139, 144, 225 A. 2d 444 (1967), "Since the jury is free to believe only a portion of the evidence of each side the synthesis apparently accomplished by the jury is simply a manifestation of its obvious function," is no less true when a judge is the trier of the facts. *Clemson v. Butler Aviation,* 266 Md. 666, 671-72, 296 A. 2d 419 (1972), and *Davidson v. Katz,* 254 Md. 69, 80, 255 A. 2d 49 (1969).

We do not find that Judge Taylor erred in his application of the law. There was testimony adduced before him from which he could have concluded, as he did conclude, that the FHA appraisal was exhibited to the Elmores prior to their execution of the contract of sale. Accordingly, we cannot say, in the language of the rule, that his judgment was clearly erroneous.

> *Motion relative to expunging certain language from appellees' brief denied; judgment affirmed; appellants to pay the costs.*