Jerry G. HARLAN, Wanda G. Harlan, Glenn F. Nabors, and Nancy A. Nabors, Plaintiffs/Appellees,

v.

Stanley Hall HARDAWAY, Defendant/Appellant.

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 11, 1990.

Permission to appeal Denied by Supreme Court Sept. 24, 1990.

Charles W. Bone, Janet P. Medlin, Ben A. Burns, Baker, Worthington, Crossley, Stansberry & Woolf, Nashville, for defendant/appellant.

Aleta Arthur Trauger, J. Graham Matherne, Wyatt, Tarrant, Combs, Gilbert & Milom, Nashville, for plaintiffs/appellees.

OPINION .

KOCH, Judge.

This appeal involves a dispute arising from the construction and sale of a condominium unit. The developers brought suit against the purchaser in the Chancery Court for Davidson County after he repudiated the purchase agreement. The trial court heard the case without a jury and awarded the developers a $38,298 judgment. The purchaser has appealed, insisting that the developers are not entitled to recover because they materially breached

the purchase agreement. We affirm the judgment.

## I.

Stanley Hall Hardaway graduated from college in 1985 and joined his family's construction business in Nashville. Sometime during 1986, he learned of a condominium development called Harbor Village being constructed on Coleman Lake in Madison and became interested in purchasing a unit there. The project was being developed by a partnership consisting of Jerry G. Harlan, Glenn F. Nabors, and their wives.

The development was in its early stages when Mr. Hardaway first visited the property. He was not interested in any of the units already under construction but told the sales agents that he was interested in another planned unit overlooking the lake. Even though the developers had not intended to build the unit at that time, they decided to change their construction schedule, thinking that it would be helpful to have a Hardaway living in their development.

Mr. Hardaway and his father agreed to purchase a unit for $139,500. On July 11, 1986, they signed a standard purchase agreement containing several handwritten changes insisted on by Mr. Hardaway's father. One of these changes was a liquidated damage clause providing for a $100 per day penalty for every day after January 31, 1987 that the use and occupancy certificate was not issued. The developers agreed to the liquidated damage clause but only in return for the Hardaways' agreement to extend the completion date to February 28, 1987.

The Hardaways also talked with the sales agents, and later with Mr. Nabors, about installing a "rubber roof" on Mr. Hardaway's unit instead of the asphalt roof being used on the other units. Mr. Nabors agreed to install a rubber roof on the unit at no additional charge even though it was more expensive and instructed the roofing subcontractor accordingly.

Constructing Mr. Hardaway's unit earlier than planned required the developers to obtain additional financing and to draw up additional plans requiring regulatory approval. These activities delayed the start of construction, and so work on Mr. Hardaway's unit did not begin until late October, 1986. Mr. Hardaway became concerned about the delay, and on November 12, 1986, he sent a letter to the development's sales agents stating that he would enforce the liquidated damage clause if his unit did not receive a use and occupancy permit by March 1, 1987.

Mr. Hardaway also became engaged during November. He and his fiancée scheduled their wedding for March 7, 1987 to enable them to move into the new condominium the week before the ceremony. The development's sales representatives and interior decorator assured them that they would do all they could to make sure that the unit was finished on time.

The young couple insisted on a number of changes in the design of their unit, including additional air conditioning, a larger deck, and a marble tub in the master bathroom. They also chose unique, fashionable interior colors and carpets that required different fixtures. The developers agreed to make these changes for an additional charge.

As the wedding approached, it became clear that the unit would not be completed on time. Mr. Hardaway expressed his disappointment in a February 24, 1987 letter and reiterated his intention to enforce the liquidated damage clause. The sales representatives assured Mr. Hardaway that every effort would be made to have the unit finished by the time he and his wife returned from their honeymoon; however, it was still not completed on March 16, 1987 when the couple returned to Nashville.

The parties signed a new purchase agreement at Mr. Hardaway's request on March 19, 1987. The terms of this agreement were the same as those in the first agreement, except for the price which had been

increased to $146,368 to reflect the cost of the extra work and for the deletion of Mr. Hardaway's father's signature. Thus, the contract still provided for a February 28, 1987 completion date even though that date had already passed and still included the liquidated damage clause.

The City issued a certificate of use and occupancy on March 27, 1987, and the parties scheduled the closing for April 3, 1987. Mr. Hardaway and his father inspected the unit on April 2, 1987. In a letter dated April 3, 1987, Mr. Hardaway notified the developers that "[t]oo much remains to be completed for us to close on April 3rd as we had hoped." He listed thirty-six items that remained to be completed and stated that he would "be forced to take some other type of action" if these items were not completed within seven days.

At his father's suggestion, Mr. Hardaway's letter raised for the first time the status of the development's other amenities. He proposed that the title company hold $3,000 in escrow to assure the completion of the swimming pool, the tennis courts, and the jogging trail. He also proposed that he should be excused from paying the monthly maintenance fee until the completion of the construction on the exterior of his unit and the other recreational amenities.

The parties met at the unit on April 8, 1987. They resolved the items on the punch list but could not agree on Mr. Hardaway's proposals concerning the maintenance fee and the escrow arrangement. The developers told Mr. Hardaway that they would not agree to these suggestions out of fairness to the other Harbor Village residents. When Mr. Hardaway and his lawyer refused to abandon these issues, Mr. Nabors told Mr. Hardaway in a raised voice, "Look son ... I am not going to listen to this anymore, and we are not going to talk about that." Mr. Hardaway abruptly left the meeting because he was offended by Mr. Nabors' comments and tone of voice.

Mr. Harlan telephoned Mr. Hardaway on April 9, 1987 to placate him and to convince him to proceed with the closing. He apologized for his partner's statements and assured Mr. Hardaway that the recreational amenities would be completed. Mr. Hardaway responded stating, "I think that definitely shows class in you but I don't think Mr. Nabors has any class, in my opinion." The sales agents also telephoned Mr. Hardaway and offered to escrow their sales commission to assure the completion of the recreational amenities.

Notwithstanding these assurances, Mr. Hardaway prepared a letter dated April 9, 1987 repudiating the contract because the unit had not been completed on February 28, 1987. He also based his action on the developers' failure to complete the swimming pool, the tennis courts, and the jogging trail and on the fact that the common areas had not yet been conveyed to the homeowners' association. Four days later, Mr. Hardaway and his wife bought a new home in Goodlettsville.

The developers sued Mr. Hardaway in November, 1987 seeking specific performance and damages. However, they were finally able to sell Mr. Hardaway's unit in December, 1987 for $140,000 and, thereafter, only sought the damages stemming from Mr. Hardaway's repudiation of the purchase agreement. The trial court heard the developers' complaint and Mr. Hardaway's counterclaim without a jury and awarded the developers $38,298.

## II.

Mr. Hardaway's first argument is that he had no obligation to perform under the purchase agreement because the developers had failed to perform a condition precedent to the agreement's enforceability. We disagree. Mr. Hardaway did not assert this defense at trial and would have been unsuccessful had he done so because the portion of the agreement on which he relies cannot reasonably be interpreted as a condition precedent.

### A.

■ The developers filed two documents in the register's office in August, 1985

when they first began to develop Harbor Village. The first was a "declaration of covenants, conditions and restrictions;" the second, the "by-laws of Harbor Village P.U.D. Assn. Inc." Even though the declaration referred to a "plat of record," the property description, attached as an exhibit to the declaration, stated that "the Plat . . . has not yet been placed on record in said Register's Office." There is, likewise, no evidence of the recordation of a master deed.

Both the purchase agreements Mr. Hardaway signed contained the following language:

> That for and in consideration of the mutual covenants set forth, Seller does hereby agree to sell unto Purchaser and Purchaser hereby agrees to purchase from Seller the following described property upon the price, terms and conditions hereinafter set forth:
>
> Building: 4
>
> Unit: 1
>
> in Harbor Village, A De Minimis PUD according to a De Mimimis [sic] PUD Plat of Harbor Village, A De Minimis PUD, a Declaration and Master Deed Establishing Harbor Village as a De Minimis PUD Association and by-laws of Harbor Village Owner's [sic] Association all of which will be filed of record in the office of the Registrar of Deeds for Davidson County, Tennessee, prior to the closing of sale.

No mention of the recordation of the master deed was made until Mr. Hardaway's April 3, 1987 letter and the fateful April 8, 1987 meeting. During the meeting, Mr. Hardaway's lawyer suggested that Mr. Hardaway should not be required to pay the monthly maintenance fee until the developers had recorded the master deed. After the developers refused to excuse the maintenance fee, Mr. Hardaway stated in his April 9, 1987 repudiation letter that the assessments could not commence until the common areas were conveyed to the owners' association.

**B.**

Mr. Hardaway's answer contained several affirmative defenses but never mentioned the lack of master deed or that the developers' failure to file the master deed was the non-performance of a condition precedent. He did not rely on this defense at trial, although he continued to insist that he could not have been required to pay the monthly maintenance fee until the master deed was recorded. The first succinct articulation of the condition precedent defense appears in Mr. Hardaway's appellate brief. It comes too late.

Appellate courts do not, as a general rule, consider issues not dealt with in the trial court and not properly developed in the proof. *See East Sevier County Util. Dist. v. Wachovia Bank & Trust Co.*, 570 S.W.2d 850, 853–54 (Tenn.1978). Thus, defenses not asserted in the trial court cannot be asserted for the first time on appeal. *Ex parte Calhoun*, 187 Tenn. 372, 375–76, 215 S.W.2d 789, 791 (1949); *Washington v. Atlanta Life Ins. Co.*, 175 Tenn. 529, 534, 136 S.W.2d 493, 494–95 (1940); *Alumax Aluminum Corp., Magnolia Div. v. Armstrong Ceiling Sys., Inc.*, 744 S.W.2d 907, 910 (Tenn.Ct.App.1987).

The non-performance of a condition precedent is an affirmative defense that must be pled. Tenn.R.Civ.P. 9.03. If it is not properly raised in the trial court, it will not be considered on appeal. *Mack v. Hugger Bros. Constr. Co.*, 10 Tenn.App. 402, 419 (1929).

**C.**

Even if Mr. Hardaway had asserted a condition precedent defense in the trial court, it would have been to no avail. The parties never intended the recordation of the master deed to be a condition precedent, and the language on which Mr. Hardaway relies is not sufficient to create one.

Whether a contractual provision is or is not a condition precedent depends upon the parties' intention which should be

gathered from the language they employ and in light of all the circumstances surrounding the contract's execution. *Buchanan v. Johnson*, 595 S.W.2d 827, 830 (Tenn.Ct.App.1979). Courts do not favor conditions precedent and will, as a general matter, construe doubtful language as imposing a duty rather than creating a condition precedent. *Buchanan v. Johnson*, 595 S.W.2d at 831; Restatement (Second) of Contracts § 227(3) (1979); 3A A. Corbin, *Corbin on Contracts* § 635 (1960).

■ The existence of a condition precedent does not depend upon the use of any particular language. *Nashville & Northwestern R.R. v. Jones*, 42 Tenn. (2 Cold.) 574, 583–84 (1865). However, the presence of a condition is usually signalled by a conditional word or phrase such as "if," "provided that," "when," "after," "as soon as," and "subject to." *Cobb v. Gross*, 291 S.C. 550, 354 S.E.2d 573, 574 (Ct.App.1987); 5 S. Williston, *A Treatise on the Law of Contracts* § 671 (3d ed. 1961); 3A A. Corbin, *Corbin on Contracts* § 639 (1960).

Having reviewed the language of the agreement relied upon by Mr. Hardaway in light of these rules of construction, we are unpersuaded that it creates a condition precedent to Mr. Hardaway's duty to perform. It was a comparatively unimportant part of the description of the property that, at most, provided for an orderly plan of procedure and whose purpose had been substantially accomplished by the recordation of the declaration and by-laws. *See McCrory v. McCormick*, 400 Ill. 203, 79 N.E.2d 485, 487–88 (1948); *Elmore v. Reese*, 268 Md. 490, 303 A.2d 381, 386 (1973); *Hill v. Benevicz*, 224 Md. 79, 167 A.2d 104, 110 (1961); *Rom Terminals, Ltd. v. Scallop Corp.*, 141 A.D.2d 358, 529 N.Y. S.2d 304, 306 (1988).

The developers' performance under the promised plan of procedure was not required at any specified time but merely "prior to the closing of the sale." Mr. Hardaway repudiated the contract prior to the closing, thereby eliminating the developers' duty to perform. Under the facts of this case, repudiation was not a remedy available to Mr. Hardaway on April 9, 1987.

■ Mr. Hardaway did not link the developers' failure to record the master deed to the validity of the purchase agreement but rather to his obligation to pay the monthly maintenance fee. Instead of repudiating the contract, he should have called on the developers for assurances that they would record the master deed prior to the closing. *See* Restatement (Second) of Contracts § 251 (1979). Had the developers failed to provide these assurances or had they failed to perform prior to the closing, Mr. Hardaway might have been justified in refusing to perform. As it was, Mr. Hardaway never gave the developers the opportunity to do either and, in doing so, effected an anticipatory repudiation of the contract.

### III.

■ Mr. Hardaway also asserts that his performance should be excused because the developers breached the purchase agreement by not completing his unit by February 28, 1987. Again we disagree. Mr. Hardaway waived his right to use the scheduled completion date as a basis for repudiating the contract.

### A.

Harbor Village's standard purchase agreement provided that "[t]ime is of the essence of this contract and each and all conditions herein." With regard to the construction of each unit, it stated:

Purchaser fully understands and is aware that Seller anticipates that the building in which the De Minimis Unit described herein will be completed as described herein if not already completed, but cannot provide a fixed date for occupancy, by reason of factors influencing the rate of construction such as, but not limited to, acts of God, strikes, wars and material shortages. In any event, Seller

will cause the said building containing the De Minimis Unit to be completed no later than ____ from the date of this contract unless grounds arise which are legally supportable to establish impossibility of performance for reasons beyond the control of the Seller.

In the event of a default by the seller, it also provided that

If for any reason consummation of this transaction is prevented after acceptance of this Agreement by Seller's act, neglect or inability to deliver as per this Agreement, the Purchaser shall be entitled to the refund of his deposit, plus interest as provided in Paragraph 1 of this Agreement, or other remedy as provided by law. In the event of cancellation of this Agreement, then all rights and obligations hereunder shall terminate.

The parties eventually agreed that the building containing Mr. Hardaway's unit would be completed on February 28, 1987. At the Hardaways' insistence, they also added a liquidated damages clause to the paragraph dealing with the seller's default that stated:

Unit shall be delivered to Buyer for occupancy prior to Feb. 28th, 1987. Seller will pay to the Buyer 100.00/day for any day after this date for a U & O certificate.

Whether the parties intended the liquidated damage clause to be Mr. Hardaway's exclusive remedy if the unit was not finished on time need not be decided because Mr. Hardaway, by his conduct both before and after February 28, 1987, waived his right to insist upon strict adherence to the scheduled completion date.

### B.

■ A contracting party may, either expressly or by conduct, waive its right to insist on the other party's strict performance. *Tennessee Adjustment Serv., Inc. v. Miller*, 54 Tenn.App. 313, 325, 390 S.W.2d 696, 701 (1964); *Morristown Lincoln–Mercury, Inc. v. Roy N. Lotspeich Publishing*

*Co.*, 42 Tenn.App. 92, 102, 298 S.W.2d 788, 793 (1957). The principle extends to the time within which contractual obligations must be performed. *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn.Ct.App.1986); *Petway v. Loew's Nashville & Knoxville Corp.*, 22 Tenn.App. 59, 67, 117 S.W.2d 975, 980 (1938); *Welch v. W.W. Dillon Co.*, 7 Tenn.App. 430, 434 (1928); *Thompson v. Menefee*, 6 Tenn.App. 118, 129 (1927).

There can be no waiver without complete knowledge of the facts. *Bailey v. Life and Casualty Ins. Co.*, 35 Tenn.App. 574, 584–85, 250 S.W.2d 99, 103 (1952). However, all the parties in this case knew well before February 28, 1987 that Mr. Hardaway's unit would not be ready for occupancy by the scheduled completion date.

Despite this knowledge, Mr. Hardaway continued to insist, both before and after February 28, 1987, that the developers perform. He signed a new contract after the completion date; he instructed the developers to complete his April 3, 1987 punch list; and he repeatedly stated that he expected liquidated damages for every day after February 28, 1987 that the developers did not obtain a use and occupancy permit for his unit. His conduct through April 8, 1987 amounts to a waiver of his right to rely on the developers' inability to complete his unit by February 28, 1987 as a basis to repudiate the purchase agreement.

### IV.

■ Finally, Mr. Hardaway insists that the developers' failure to install a rubber roof on his unit justified repudiating the purchase agreement. Again we disagree. The agreement does not require the developers to install a rubber roof.

The standard specifications for the Harbor Village units called for built-up asphalt roofs. Mr. Hardaway's father preferred another type of roofing material and, during the negotiations, asked the developers to install a "rubber roof" instead. The developers agreed to install a "rubber roof" after the purchase agreement was

signed, but the parties never amended the purchase agreement to reflect their understanding about the rubber roof.[1]

The developers instructed their roofer to install a "rubber roof" on Mr. Hardaway's unit. The roofer installed what he called a "rubberized roof," one better able to accommodate the expansion and contraction caused by the changes in the weather. Mr. Hardaway's father inspected the roof after it was finished and decided that it was not the type of roof he had in mind when he requested a "rubber roof." He called this to the developers' attention and requested that his son be provided with a ten-year warranty on the materials and workmanship. The developers obtained a ten-year manufacturer's warranty on the materials and a similar workmanship warranty from the roofer.

The developers' failure to install a "rubber roof" satisfactory to Mr. Hardaway's father is not a material breach of the purchase agreement because the agreement does not require the developers to install a rubber roof. It is, at most, a breach of a separate oral agreement entered into contemporaneously with the purchase agreement. It cannot provide Mr. Hardaway with a reason to repudiate the purchase agreement unless it also demonstrated that the developers had abandoned the purchase agreement or had completely disabled themselves from substantially performing. *See Church of Christ Home for Aged, Inc. v. Nashville Trust Co.*, 184 Tenn. 629, 642, 202 S.W.2d 178, 183 (1947); *Brady v. Oliver*, 125 Tenn. 595, 614, 147 S.W. 1135, 1139 (1911).

The installation of a "rubberized roof" instead of a "rubber roof" is not evidence that the developers intended to abandon the purchase agreement or that they had disabled themselves from performing. By

the time Mr. Hardaway repudiated the agreement, the developers had obtained the ten-year warranties requested by his father and had agreed to repair minor defects in the roof's installation. Rather than abandoning their contract, the developers were attempting to honor it when Mr. Hardaway repudiated the contract.

■ Mr. Hardaway should have honored rather than repudiated the contract. If using a "rubberized roof" instead of a "rubber roof" was a material shortcoming, then Mr. Hardaway could have sought damages for the diminished value of the unit. However, since he has failed to prove that the "rubberized roof" was not the functional equivalent of a "rubber roof," he has failed to demonstrate that he was entitled to damages or to repudiate the purchase agreement.

### V.

We affirm the judgment and remand the case for whatever further proceedings may be required. We also tax the costs of this appeal to Stanley Hall Hardaway and his surety for which execution, if necessary, may issue.

TODD, P.J., and CANTRELL, J., concur.

---

1. Accordingly, the purchase agreement is silent about the installation of a "rubber roof." It provides only that

    proposed improvements upon the De Minimis Property shall be substantially similar to the

drawings shown to Purchaser; however, the Seller shall have the right to make reasonable modifications to the plans and specifications as it deems advisable.