KAYLA NICOLE NUNLEY,               )
                                   )
        Plaintiff/Appellee,        )
                                   )     Appeal No.
VS.                                )     01-A-01-9508-PB-00350
                                   )
ESTATE OF BILLY G. NUNLEY,         )     Davidson Probate
                                   )     No. 89D-2305
        Defendant/Appellee,        )
                                   )
and                                )     ┌──────────────────────┐
                                   )     │                      │
EARL MONTGOMERY,                   )     │  **FILED**           │
                                   )     │                      │
        Defendant/Appellant.       )     │  **February 7, 1996**│
                                         │                      │
                                         │  **Cecil W. Crowson**│
                                         │ **Appellate Court Clerk**│
                                         └──────────────────────┘

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE


APPEALED FROM THE PROBATE COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE

THE HONORABLE JAMES R. EVERETT, JR., JUDGE

THOMAS H. WARE
WARE & CRAWFORD
1800 Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee  37219
        Attorney for Plaintiff/Appellee

ANN BUNTIN STEINER
STEINER & STEINER
214 Second Avenue North, Suite 203
Nashville, Tennessee  37201-1644
        Attorney for Defendant/Appellee

DAN R. ALEXANDER
2016 8th Avenue South
Nashville, Tennessee  37204
        Attorney for Defendant/Appellant

AFFIRMED AND REMANDED



                              BEN H. CANTRELL, JUDGE


CONCUR:
LEWIS, J.
KOCH, J.

# O P I N I O N

This case involves the ownership of the mechanical royalty rights to a catalogue of songs written by the appellant, Earl Montgomery. The appellee, Kayla Nicole Nunley, contends that her late husband, Billy Gene Nunley, purchased the right to collect those royalties from Mr. Montgomery in 1975. Mr. Montgomery testified that he never sold the rights, and that he did not even know Mr. Nunley. He claims that the Nunleys were guilty of converting the funds derived from his ownership rights.

The proof shows that the Nunleys received royalty checks from Mr. Montgomery's publisher and its successors for almost 20 years, and that Mr. Montgomery did not receive any mechanical royalties after the rights were purportedly sold to Mr. Nunley. Mr. Montgomery admitted that he was aware that he had stopped receiving checks sometime in the mid-1970s, but claimed that he was unable to discover the reason. The trial court found that Mr. Montgomery's claim for conversion was precluded by laches. We also find that Mr. Montgomery failed to prove his right for the royalties, and, therefore, affirm the lower court's decision.

## I.

Though the testimony of Mr. Montgomery is diametrically opposed to that of Mrs. Nunley and two other witnesses, there is no dispute about the nature and origin of the rights at issue. Between 1970 and 1975, songwriter Earl Montgomery worked under an exclusive five year contract with AlTam Music Publishing Company. AlTam was owned by Al Gallico and Tammy Wynette, and the company name was created by combining their first names. Mr. Montgomery wrote numerous songs during his period of employment with AlTam. The publisher paid him monthly

advances of $1,000 against the royalties he was expected to receive from the sale of records and tapes containing his songs.

Such royalties are called mechanical royalties. They are generally handled by an agency that specializes in collecting them from record companies. The royalties are forwarded by the agency to the publisher every six months. The publisher then distributes the writer's share to him. The contract between AlTam and Mr. Montgomery provided that the mechanical royalties would be divided equally between the publisher and the songwriter, with adjustments for the money advanced.

Mr. Montgomery also received (and still receives) performance royalties, which accumulate when a writer's songs are played on the radio, used in movies or television, or performed in live concerts. Performance royalties are paid directly to the writer by the licensing agency he contracts with. Mr. Montgomery's licensing agent is Broadcast Music Incorporated (BMI). BMI sends a performance royalty check to Mr. Montgomery every three months.

## II.

Alsey "Shugg" Baggett, former manager of George Jones, and a friend and associate of Earl Montgomery, testified that around 1975 Mr. Montgomery told him that he needed money, and that Mr. Baggett put him in touch with Bill Nunley, an investor who was not particularly involved in the music business. Mr. Nunley receiving assurances from Mr. Baggett that the deal was a good one, and allegedly agreed to pay Mr. Montgomery $10,000 for the mechanical rights to his songs in the AlTam catalog. Mr. Nunley's cash was tied up with a car dealership, so he decided to borrow the money to pay for the rights.

Mr. Nunley, Mr. Montgomery, and Mr. Baggett met a banker named Clarence Reynolds at the Commerce Union Bank and Mr. Nunley borrowed $10,000 on his personal note. Mr. Montgomery admitted that he was present at a meeting with Clarence Reynolds and some other individuals at around that same time, but he insisted the meeting had a different purpose, and he denied that he knew at the time who Mr. Nunley was.

A few months later, Emmy Lou Harris recorded "One of These Days," one of Mr. Montgomery's songs from the catalog. It became a huge hit, and Mr. Nunley recouped his investment and was able to pay off the note in very short order. He subsequently moved to Arizona and continued to receive royalty checks. Copies of three of those checks, drawn on AlTam's account, made out to Mr. Nunley as payee, and each containing a notation that it was for royalties, have been made exhibits to the record in this case.

Because of personal frictions, AlTam chose not to renew Mr. Montgomery's contract. Paul Ritchie, a publisher for whom Mr. Montgomery subsequently worked, testified that in 1983 or 1984, he and Mr. Montgomery discussed the songwriter's desire to have the rights to the songs he had written for AlTam restored to him. Mr. Ritchie was going to Phoenix on other business, and he agreed to approach Mr. Nunley about selling the rights back to Mr. Montgomery. Mr. Nunley was not interested in the proposal, and he informed Mr. Ritchie that in any case he no longer had exclusive rights to the proceeds of the AlTam catalog, as he and Mrs. Nunley had divorced in 1983, and one-half of the rights had been transferred to her in the divorce decree.

Subsequent events have complicated the task of proving or disproving the sale of the mechanical royalties. In 1989, Mr. Nunley was diagnosed with brain cancer, and had to undergo surgery, which left him considerably weakened. Also in

1989, Mr. Nunley's home was completely destroyed by a fire which consumed all his financial records. The appellees were unable to produce a copy of the contract of sale at trial, purportedly because of the fire.

Mr. Nunley and his ex-wife moved back to Tennessee, and their Maricopa County divorce decree was domesticated in Davidson County. Mr. Nunley's short-term memory was impaired by his condition and its treatment, and he failed to send Kayla Nunley her share of the royalties. She filed a contempt petition that resulted in an agreed order that in the future, her share of the AlTam royalties would be paid directly to her by the publisher, rather than being disbursed by Mr. Nunley.

However the agreed order did not solve Mrs. Nunley's payment problems. The principals in Altam sold the company. The purchaser was Coca-Cola, which only held the property a short time before selling it to MCA. A check from MCA did come into Mrs. Nunley's possession, but the check, for $3,423.07, was made out to Earl Montgomery c/o Billy Nunley. Mrs. Nunley called Earl Montgomery, and spoke to his wife Charlene, seeking some guidance on handling the check. The significance of this phone call is that Earl Montgomery subsequently claimed that it provided him with the first clue as to where his royalty checks had been going for so many years.

Mrs. Nunley became convinced that her former husband and Mr. Montgomery were conspiring to deprive her of her rightful share of the royalties. She accordingly filed a second contempt petition, naming both of them, and asking for an accounting of all royalties, and for payment of her share. Mr. Montgomery's answer contained a cross-claim against Mr. Nunley, and a counter-claim against Mrs. Nunley. Mr. Montgomery contended that he had never surrendered his royalty rights. He charged the Nunleys with conversion, and asked for an accounting, and for judgment against the Nunleys for sums received.

During trial, Paul Ritchie testified that several months earlier, Mr. Montgomery told him that he had learned that the Nunleys had lost the purchase agreement, and that he had decided to deny that the sale ever happened. When Mr. Montgomery was on the stand, he denied having any business connection with Mr. Nunley, and denied that he had ever sold the mechanical rights to anyone. Under direct questioning, he was asked what steps he had taken to discover what had happened to the royalty checks he allegedly expected to receive:

> Q. Now, Mr. Montgomery, when the time came that you stopped receiving these mechanical royalties, what, if anything, did you do to try to find out what was happening to your royalties?
>
> A. We tried to make contact with Mr. Gallico ... *(some colloquy between the attorneys followed, and then Mr. Montgomery resumed)*. . . Okay. I tried to contract Mr.Gallico on several occasions. And I was also in his presence in Los Angeles at the Pop Awards one night, and I tried to confront him about it, which was not a proper place, with Barry Manilow and people at the table that night, and so he said we'd talk about it later. But many times I tried to call and he would be out or I couldn't get to him or he'd be in L.A. or New York.

### III.

The elements of the appellant's argument may be summarized as follows: It is undisputed that he is the author of the songs in question, and that he possessed the mechanical rights to them when he was under contract to AlTam; the appellees cannot produce a written contract showing that he transferred those rights; and the Statute of Frauds contained in Tenn. Code Ann. § 47-1-206 requires a writing indicating a contract between the parties before a court can enforce a sale of this kind of property.

However, the trial court explicitly found that the royalty rights in question were vested in the Nunleys, thus impliedly finding that a valid contract existed, even though the appellees could not produce a copy of it in court. In the light of the

overwhelming evidence in the record, as to the assignment of the royalty rights, the testimony of Mr. Ritchie concerning his mission in Phoenix and his conversations with Mr. Montgomery, and Mr. Nunley's affidavit as to the destruction of his papers in the house fire, we cannot say that the evidence preponderates against the trial court's finding. The trial court was justified in finding that Mr. Montgomery's testimony that he did not sell his royalty rights to Mr. Nunley was not worthy of belief.

We note also that in the present posture of the case, the appellees are not asking the court to enforce the contract. Instead, the appellant is asking the court to find that the appellees converted his property. Though the nature of the appellant's claim places the burden on him to prove the alleged conversion, he attempts to shift the burden to the Nunleys by asserting that they must prove the existence of a contract transferring the royalty rights at issue in order to prevail. We do not believe they are required to assume that burden.

As to the Statute of Frauds argument, the contract is no longer executory; it was fully performed twenty years ago. The evidence is overwhelming that Mr. Montgomery assigned his royalty rights pursuant to the agreement. "If an oral contract, otherwise within the statute is completely executed or performed, it is taken out of the operation of that statute." 73 Am. Jur. 2d *Statute of Frauds* § 527.

## IV.

Even if the Nunleys had converted Mr. Montgomery's property (and we believe the facts preponderate otherwise), Mr. Montgomery would still not be entitled to prevail on his claim, as the proof shows him to have been been guilty of unreasonable delay in pursuing his rights. See *Hannewald v. Fairfield Communities, Inc.*, 651 S.W.2d 222, 228 (Tenn.App. 1983). Such delay calls the equitable doctrine

of laches into play to prevent the assertion of stale claims. See *Parker v. Bethel Hotel Co.*, 34 S.W. 209, 217, 96 Tenn. 252, 285 (1896).

The proof shows that Mr. Nunley collected mechanical royalties for about seventeen years before a claim was asserted against his right to do so. The explanation for the delay given by Mr. Montgomery, that he was unable to get in touch with Mr. Gallico to learn to whom the checks were being sent, does not strike us as reasonable. There are no allegations that Mr. Gallico went out of business or into hiding, but merely that he didn't return Mr. Montgomery's phone calls. Given the value of the rights at issue, and their importance to Mr. Montgomery, it is hard to believe that he would not have made a more vigorous effort to have them restored, if he truly believed he was entitled to them.

We note, however, that delay by itself is not sufficient to invoke the doctrine of laches. As this court said in the case of *Brister v. Brubaker's Estate,* 336 S.W.2d 326, 332, 47 Tenn.App. 150, 162 (1960), "[T]he determinative test as to laches, which may be available as a successful defense, is not the length of time that has elapsed, but whether, because of such lapse of time, the party relying on laches as a defense has been prejudiced by the delay." See also *Parker v. Bethel Hotel*, 34 S.W. at 217, 96 Tenn. at 285.

The facts of the instant case present almost a textbook example of prejudice induced by delay, as may be seen by the following passage:

### §170. Prejudice by reason of defendant's inability to defend: unavailability of evidence.

The prejudicial situation in which the complainant's suit places the defendant may be occasioned by inability on the part of the latter, because of the complainant's delay in asserting his claim, to produce evidence in defense thereof, where matters of proof have been lost, witnesses have died, and the transaction giving rise to the suit has become obscured by the lapse of time. Furthermore, relief may be

denied where it appears that one who participated in the disputed transaction has died or has suffered impairment of memory or mental facilities. 27 Am. Jur. 2d *Equity* §170 (1966).

The consequences of delay in the present case include the 1989 destruction of Mr. Nunley's records which made it difficult to establish that he legitimately acquired the rights at issue, his deteriorating condition, which made it impossible for him to testify in court, and his death prior to the filing of the final order in this case. It would be difficult to find a clearer example of prejudice to a defendant, arising from a plaintiff's delay in bringing his claim.

**V.**

The judgment of the trial court is affirmed. Remand this cause to the Probate Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

_____
BEN H. CANTRELL, JUDGE

CONCUR:


_____
SAMUEL L. LEWIS, JUDGE


_____
WILLIAM C. KOCH, JR., JUDGE