IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS OCTOBER 30, 2008

## GERRY GALLIMORE, ET AL. v. REBA GALLIMORE

**Direct Appeal from the Chancery Court for Weakley County**
**No. 20,269     William Michael Maloan, Chancellor**

**No. W2008-00856-COA-R3-CV - Filed April 2, 2009**

This case involves a dispute between a decedent's ex-wife and the decedent's heirs. When the decedent and the ex-wife divorced, their marital dissolution agreement provided that the decedent would receive certain real property. When the decedent died four years later, the ex-wife had not executed a quitclaim deed conveying her interest in the property to the decedent. Therefore, the heirs filed this action to quiet title. The ex-wife claimed that the decedent wanted her to retain her interest in the property, and she claimed that the heirs were barred from seeking relief under the doctrines of laches and waiver. The trial court found in favor of the heirs, and the ex-wife appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Jeffery T. Washburn, Dresden, TN, for Appellant

James H. Bradberry, Dresden, TN, for Appellee

**OPINION**

# I. FACTS & PROCEDURAL HISTORY

Ronnie and Reba Gallimore were married from 1999 to 2003. During the marriage, Ronnie's siblings executed a quitclaim deed conveying a parcel of property, consisting of a house and lot, to Ronnie and Reba as tenants by the entirety. When Ronnie and Reba divorced in 2003, they entered into a marital dissolution agreement ("MDA") providing that Ronnie would retain sole ownership of the property, and Reba would execute the documents necessary to convey her interest in the property to Ronnie.

In 2007, Ronnie died suddenly due to a heart attack. Reba had not conveyed her interest in the property to Ronnie prior to his death. Ronnie's heirs, who were his siblings, nieces and nephews, filed a complaint to quiet title to the property. They sought an order divesting Reba of title to the property or requiring Reba to execute a quitclaim deed conveying her interest in the property to the estate. Reba filed an answer asserting that the doctrines of laches and waiver barred the heirs from seeking relief, and she also claimed that Ronnie had expressed his desire not to remove her name from the deed. Reba maintained that she owned a one-half undivided interest in the property because the tenancy by the entirety was converted to a tenancy in common as a result of the divorce.

At trial, Reba testified that she and Ronnie had maintained a friendly relationship since the divorce, as they continued to work at the same office. She said Ronnie continued to send her Valentine's Day gifts and flowers, and he still had a license plate on his truck that read "Ronnie and Reba." Reba acknowledged that she was dating someone else, and that her boyfriend lived in the same house where she lived, but she said Ronnie knew she was dating another man. Reba said she had a key to Ronnie's house and still had personal property there at the time of Ronnie's death. She explained that she moved into a very small house after the divorce, and Ronnie allowed her to leave some things at his house in order to avoid paying storage fees. Reba's daughter testified that she also had a key to Ronnie's house because she had left some of her belongings there after she and Reba moved out.

Reba testified that three to four months after the divorce, she asked Ronnie if he wanted "to go and get a new deed drawn up to take [her] name off." She said Ronnie told her no and that he was not worried about it. According to Reba, she then told Ronnie that whenever he wanted to go, she would go and sign the deed.

In September of 2004, nearly a year after the divorce, the City of Dresden needed an easement over and across the property in order to repair and maintain a storm water drain partially located in the front yard of the property. The City's attorney prepared a document by which Ronnie and Reba would grant the easement to the City. Reba testified that Ronnie brought the document to work and told her that she needed to sign it because her name was still on the deed. Ronnie and Reba never discussed the deed again.

Reba testified that after Ronnie's death, she learned that she was still listed as the beneficiary of his life insurance policy and his retirement account. In addition, her name was still listed on his

checking account. Reba testified that she received over $50,000 from these accounts after Ronnie's death, despite a provision in the MDA providing that Reba waived all right, title and interest in and to Ronnie's property and estate, including insurance, contractual, and retirement benefits.[1] Reba admitted that she was surprised that her name was still listed as the beneficiary of Ronnie's retirement account when he died, and she also said she did not think she had an interest in his life insurance policy due to the provision in the MDA. Reba insisted that nothing prevented Ronnie from executing the documents necessary to remove her name from these accounts or the deed to the house. She claimed that Ronnie simply ignored the provisions of the MDA.

Gerry Gallimore, who was Ronnie's brother and the executor of his estate, also testified at trial. Gerry testified that Ronnie moved into the house at issue in 1965 to live with their mother after their father died. Gerry testified that their mother left the property to Ronnie when she died, but her will was not probated, so he and his siblings executed the quitclaim deed to Ronnie and Reba. Gerry described Ronnie as a procrastinator and said he "wasn't in a hurry" about getting things done. As an example, he pointed out that the electric bill at Ronnie's house was still listed in Ronnie's father's name when Ronnie died in 2007, although Ronnie's father died in 1963. Gerry testified that in sorting through Ronnie's belongings and paperwork after his death, he found an unexecuted quitclaim deed which would convey Reba's interest in the property to Ronnie. This deed, introduced as an exhibit at trial, states that it was prepared by an attorney in Martin. The dates listed in the document read, "this ___ day of January, 2007."

Terry Gallimore, another one of Ronnie's brothers, also testified that Ronnie was slow about getting things done and "just didn't get in no hurry." Terry testified that he would go with Ronnie when he would buy vehicles and "do the dealing" for him. Terry said that 99 percent of the time, someone had to be with Ronnie in order for him to get things done. Terry said that he and Ronnie discussed the deed to the property "from time to time" after Ronnie and Reba divorced, and that sometime around the beginning of 2007, Ronnie told him that he was "going to Martin to get that [taken] care of."

The supervisor at the office where Ronnie and Reba worked testified that they were "always nice and friendly to each other," and that he did not notice a change in their behavior after the divorce. He said Ronnie was a great employee, and he would not describe Ronnie as a procrastinator. However, the supervisor said he had no knowledge about Ronnie's personal business because he was quiet and kept to himself. Another co-worker also testified that Ronnie and Reba "were still friends" after the divorce. This co-worker also said that Ronnie was not a procrastinator, but he said he was not surprised by the fact that Ronnie's electric bill was still in his father's name because "[Ronnie] had certain ways about him like that."

Another employee, who worked in the finance department at Ronnie's place of employment, testified as well. She said that Ronnie asked her, just a few months prior to his death, "do I have to

---

[1] The disposition of these funds was not challenged in the trial court and is not at issue on appeal.

change the beneficiary on my retirement?" The employee testified that she told Ronnie, "no, you can leave it whoever you want to," and Ronnie said "okay" and left.

Reba disputed the other witnesses' characterization of Ronnie as a procrastinator and said that he decided to leave the electric bill in his father's name to avoid paying charges to have it changed.

On March 25, 2008, the chancellor entered an order finding that "the conduct of the parties subsequent to the divorce does not overcome the contractual obligation confirmed by the Final Decree of Divorce." The court found that although the property was never transferred, Ronnie did have a quitclaim deed prepared in January of 2007. The court divested title to the property from Reba and vested title in Ronnie's heirs. Reba timely filed a notice of appeal.

## II. ISSUE PRESENTED

On appeal, Reba presents the following issue for review: "Whether the Chancery Court of Weakley County, Tennessee, erred by finding and so ruling that the Appellant[']s interest in the real property should be divested out of the Appellant and vested in the intestate heirs of the decedent, Ronald L. Gallimore." For the following reasons, we affirm the decision of the chancery court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. *Post-Divorce Agreements*

"A marital dissolution agreement is a contract between parties contemplating divorce." *Hannahan v. Hannahan*, 247 S.W.3d 625, 627 (Tenn. Ct. App. 2007) (citing *Gray v. Estate of Gray*, 993 S.W.2d 59, 63 (Tenn. Ct. App. 1998)). When a divorce decree becomes final, a marital dissolution agreement merges into the decree as to matters of child support and alimony, and the trial court has continuing statutory power to modify the decree as to those matters when justified by changed circumstances. *Id.* (citing *Penland v. Penland*, 521 S.W.2d 222, 224 (Tenn. 1975)).

However, to the extent that a marital dissolution agreement is an agreement as to the distribution of marital property, it does not lose its contractual nature by merger into the divorce decree and is not subject to later modification by the court. *Id.* (citing *Towner v. Towner*, 858 S.W.2d 888 (Tenn. 1993)). A marital dissolution agreement, as a property settlement agreement, retains its contractual nature and is subject to modification by the parties. *Id.*

On appeal, Reba contends that Ronnie, "subsequent to the divorce[,] engaged in a course of conduct and acts indicative of his intent not to have her name removed from the real estate[.]" She cites three cases in which courts have refused to enforce provisions of marital dissolution agreements based upon subsequent agreements between the parties.

The first case Reba relies upon is ***Mitchell v. Mitchell***, No. 01A01-9206-CV-00244, 1993 WL 33765 (Tenn. Ct. App. M.S. Feb. 10, 1993), *rev'd on other grounds*, 876 S.W.2d 830 (Tenn. 1994). In that case, the parties' marital dissolution agreement provided that the husband would continue to pay the mortgage against the property where the wife lived. *Id.* at *1. Soon after the divorce, however, the wife decided to sell that house, and she and the husband informally agreed to purchase another house as tenants in common, with the husband paying the mortgage on the new house. *Id.* at *2. They later decided to sell the second house, and the parties' attorneys wrote formal letters evidencing the terms of their agreement. *Id.* When subsequent disagreements arose, the husband claimed that the parties' informal modifications to the marital dissolution agreement were not binding. *Id.* at *4. The Court of Appeals explained,

> Parties who ignore their court-approved property settlement agreement do so at their peril. An individual party who unilaterally chooses to ignore the agreement may be held in contempt. When both parties ignore their property settlement agreement, the courts will reorder their rights and obligations in light of both the terms of their original agreement and their post-divorce agreements or conduct.

*Id.* The Court rejected the husband's argument that the parties could not modify their marital dissolution agreement, stating that the husband's argument "overlook[ed] the most rudimentary principles of contract law." *Id.* The Court explained that "[c]ontracts require an offer, an effective acceptance of the offer, and adequate consideration." *Id.* at *5. Finding each of those elements present, the Court found that the Mitchells entered into enforceable agreements that were inconsistent with their original property settlement agreement. *Id.* at *4.

The next case cited by Reba is ***Holland v. Holland***, No. M1999-02791-COA-R3-CV, 2001 WL 585107, at *1 (Tenn. Ct. App. June 1, 2001), in which the parties' divorce decree required the wife to assume responsibility for a $20,000 debt in the husband's name. Later, the parties entered into a handwritten agreement providing that the husband released the wife from her obligation to pay the $20,000 debt in exchange for her agreement to use her credit to help him purchase a truck. *Id.* The Court of Appeals warned that

> [w]hen both parties ignore their court-approved agreement, they run the risk that the court will decline to recognize their claims based on their later, unapproved

agreement should something go awry. Thus, the prudent course is to obtain court approval when the parties agree to a new arrangement that differs materially from the terms of their original agreement approved in the final decree.

However, both the trial and appellate courts understand through experience that parties in divorce cases frequently engage in self-help with regard to the division of their marital estates. It is not uncommon for divorce decrees to leave details regarding the division of personal property to the parties or for the parties to change their minds once a final decree has been entered. In these circumstances, the parties frequently reach accommodations that suit their particular circumstances. In cases where the rights of third parties are not adversely affected, divorced parties should be encouraged to resolve their differences without returning to the courts. Thus, rather than invalidating post-divorce agreements by adopting a per se rule against them, the better course is to apply normal principles of contract law to the post-divorce agreements in which the parties undertake to alter or waive their rights embodied in the final divorce decree.

*Id.* at *2 (footnote and citations omitted). Applying basic contract law, the Court found that the parties' post-divorce agreement was valid and enforceable, stating, "The parties have no dispute regarding the terms of their agreement, and these terms are sufficiently definite to be enforced and are supported by adequate consideration." *Id.* at *3.

The final case Reba cites, ***Puckett v. Harrison***, No. 02A01-9708-CH-00184, 1998 WL 464896 (Tenn. Ct. App. W.S. Aug. 11, 1998), involved a situation similar to the case before us. When Mr. and Mrs. Harrison divorced, they entered into a marital dissolution agreement providing that Mr. Harrison was entitled to ownership of all the parties' real estate, but Mrs. Harrison had the right to use some of the property until her death or remarriage. *Id.* at *1. One month later, Mr. and Mrs. Harrison went to a law office to have a deed of trust prepared. *Id.* The lawyer learned that certain property was still titled in the names of Mr. and Mrs. Harrison, and she advised Mr. Harrison of his right to have Mrs. Harrison quitclaim her interest in the property to him. *Id.* Mr. Harrison insisted that he wanted nothing changed and said he had things just how he wanted them. *Id.* Mr. Harrison later discovered that he was terminally ill with cancer, and he had several conversations with family members and friends in which he communicated his desire to leave the property as it was because Mrs. Harrison had worked for the property just as he had. *Id.* When Mr. Harrison died, Mrs. Harrison's name was still on the deed. *Id.* at *2. Mr. Harrison's family members and friends, and the attorney who counseled him regarding the deed, all testified at trial about his intention to forego the provisions of the marital dissolution agreement in order to allow Mrs. Harrison to retain her interest in the property. *Id.* at *3. Based on this testimony, the trial court found that Mr. Harrison "had reached a decision on his own or with [Mrs. Harrison] that he would not enforce his right to receive a quitclaim deed from [Mrs. Harrison] to the subject property." *Id.* at *2. The Court of Appeals found that the evidence supported the trial court's conclusion. *Id.* at *4.

We find each of these three cases distinguishable from the case at bar. In ***Mitchell*** and ***Holland***, there was documentary evidence of the parties' post-divorce agreements, and the parties

did not dispute the existence of those agreements. In this case, there is absolutely no evidence of a binding agreement between the parties modifying the provisions of the MDA. "Oral contracts are enforceable, but persons seeking to enforce them must prove mutual assent to the terms of the agreement and must also demonstrate that the terms of the contract are sufficiently definite to be enforceable." **Holland**, 2001 WL 585107, at *3. Reba testified that she told Ronnie, during their one conversation about having a deed prepared, that she would go with him to execute the deed whenever he was ready. Clearly then, she did not believe, based on this one conversation, that Ronnie did not intend to enforce the provisions of the MDA.

In **Puckett v. Harrison**, numerous witnesses testified about their discussions with the decedent, prior to his foreseeable death, that he wanted to ignore the marital dissolution agreement and allow his ex-wife to retain her interest in the property at issue. There was no such testimony in this case. Reba simply assumes that Ronnie wanted her to have the property because he did not bring her a deed to sign or change the beneficiaries on certain accounts prior to his death. However, witnesses testified about Ronnie's tendency to procrastinate about handling such personal matters. In addition, Ronnie retained a local attorney to prepare the quitclaim deed just months before his death, and he told his brother that he was going to get the issue "[taken] care of." Ronnie died suddenly and unexpectedly later that year. Therefore, we find no error in the trial court's conclusion that Ronnie's conduct did not evidence an intent to allow Reba to retain her interest in the property.

### B. Waiver

Next, Reba asserts that Ronnie waived his right to require her to deed the property to him. "A contracting party may, either expressly or by conduct, waive its right to insist upon the other party's strict performance of a contract." **Cherry, Bekaert & Holland v. Childree**, No. 01A01-9410-CH-00498, 1995 WL 316257, at *5 (Tenn. Ct. App. May 26, 1995) (citing *Tenn. Adjustment Servs., Inc. v. Miller*, 390 S.W.2d 696, 701 (Tenn. Ct. App. 1964)). "In order to constitute a waiver, a party's conduct must reasonably manifest an intention not to claim the right at issue." **Id.**

> Waiver is a voluntary relinquishment or renunciation of some right, a foregoing or giving up of some benefit or advantage, which, but for such waiver, he would have enjoyed. It may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was his intention and purpose to waive.

**Knoxville Rod & Bearing, Inc. v. Bettis Corp. of Knoxville, Inc.**, 672 S.W.2d 203, 208 (Tenn. Ct. App. 1983) (quoting *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942)). However, "[t]he acts or course of conduct referred to 'must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver.'" **Id.** (quoting *Gitter v. Tenn. Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969)). We are unable to find such clear and unequivocal acts by Ronnie demonstrating an intention to waive the provisions of the MDA.

### C. Laches

Finally, Reba claims that Ronnie's heirs should be barred by the doctrine of laches due to the fact that Ronnie did not pursue his right to enforce the MDA during the four years after the divorce.

"Unreasonable delay in pursuing rights calls the equitable doctrine of *laches* into play to prevent assertion of stale claims." ***Tenn. Pine Co. v. Via***, No. W1999-00558-COA-R3-CV, 2000 WL 34411147, at *5 (Tenn. Ct. App. Aug. 25, 2000) (citing *Nunley v. Nunley*, 925 S.W.2d 538, 542 (Tenn. Ct. App. 1996)). However, delay, by itself, is not sufficient to invoke the doctrine of laches. ***Id.*** The determinative test "is not the length of time that has elapsed, but whether, because of such lapse of time, the party relying on laches as a defense has been prejudiced by the delay." ***Id.*** (quoting *Nunley*, 925 S.W.2d at 542). "Generally, the doctrine of laches applies to actions not governed by a statute of limitations." ***Briceno v. Briceno***, No. M2006-01927-COA-R3-CV, 2007 WL 4146280, at *4 (Tenn. Ct. App. W.S. Nov. 21, 2007) (citing *Gleason v. Gleason*, 164 S.W.3d 588, 592 (Tenn. Ct. App. 2004); *Dennis Joslin Co. v. Johnson*, 138 S.W.3d 197, 201 (Tenn. Ct. App. 2003)). Where the action is governed by a statute of limitations, the doctrine of laches may shorten that time period if the plaintiff is guilty of gross laches by unreasonably acquiescing in adverse rights for a long duration of time, causing "prejudice to the defendant such as the loss of evidence and witnesses or a considerable accumulation of interest resulting from the unjustified delay of the plaintiff." ***Id.*** (citations omitted). A trial court's decision regarding whether to apply the doctrine of laches will not be reversed absent an abuse of discretion. ***Id.*** at *3; ***In re Estate of Baker v. King***, 207 S.W.3d 254, 264 (Tenn. Ct. App. 2006); ***Griffin v. Lester***, No. W2004-02072-COA-R3-CV, 2005 WL 3199279, at *5 (Tenn. Ct. App. Nov. 30, 2005); ***Tenn. Pine Co.***, 2000 WL 34411147, at *6. "It is an equitable defense which requires the finder of fact to determine whether it would be inequitable or unjust to enforce the claimant's rights." ***Estate of Baker***, 207 S.W.3d at 264. We find no abuse of the trial court's discretion in its refusal to apply the doctrine of laches.

### V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to the appellant, Reba Gallimore, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.